[Cite as *State v. Delmonico*, 2020-Ohio-3368.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                   :

    Plaintiff-Appellee,                      :

                               No. 108578

v.                                               :

MICHAEL DELMONICO,                               :

    Defendant-Appellant.                     :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 18, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-628494-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Katherine Mullin and Jennifer King, Assistant Prosecuting Attorneys, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and Robert B. McCaleb, Assistant Public Defender, *for appellant.*

RAYMOND C. HEADEN, J.:

{¶ 1} Defendant-appellant Michael Delmonico ("Delmonico") appeals his convictions under Counts 1 and 2, grand theft, fourth-degree felonies, and under Count 3, theft with an elderly specification, a third-degree felony, all charged in violation of R.C. 2913.02(A)(2). For the reasons that follow, we affirm Delmonico's convictions.

## I. Procedural and Substantive History

### A. Statement of Facts

{¶ 2} Delmonico owned and operated ProCode Construction, L.L.C. ("ProCode"), and held himself out as a general contractor, primarily in the residential arena. Delmonico's responsibilities included coordinating construction and renovation projects. Initially, Delmonico researched each project, determined the scope of work, needed supplies, and presented a proposal to the property owner. After a client committed to a contract, Delmonico managed the supply of materials and facilitated the completion of each project. Depending upon the project, Delmonico either hired subcontractors to perform the contracted services or Delmonico worked with his subcontractors to fulfill his contractual duties. Delmonico had approximately thirty clients in 2017. This case stems from criminal charges, brought against Delmonico personally, which arose out of three separate business dealings with three separate clients — Vickie Krupka ("Krupka"), Joyce Conway ("Joyce"), and Jessica Smith[1] ("Smith").

---

[1] Jessica Smith previously went by the name Jessica Braun.

**{¶ 3}** Delmonico contracted to perform construction work at the clients' homes, and he accepted payment from each client in conjunction with their contracts. At the time they executed their contracts, the clients were unaware that Delmonico was experiencing a cash-flow problem where his expenses were greater than the payments he received from his individual clients.

**{¶ 4}** The details of the clients' contracted services and the work performed by Delmonico are as follows. [2]

### 1. Vickie Krupka

**{¶ 5}** Krupka contracted with Delmonico on August 17, 2017, to repair her two-story front porch in Lakewood, Ohio. (Tr. 786.) Fourteen tasks were detailed within the contract. (State's exhibit No. 1.) Upon execution of the contract, Krupka paid fifty percent of the bid price, $8,375. (Tr. 792-793.) The contract reflected a completion date of October or November 2017, depending upon the weather. (Tr. 793.) Delmonico failed to communicate with Krupka following the execution of her contract, and Krupka texted him on October 20, 2017, and requested a start date.

---

[2] Delmonico contracted with his clients on behalf of his business, ProCode. Krupka, Joyce, and Smith provided Delmonico with checks made payable to ProCode and Delmonico deposited the checks in his business account. Delmonico used the ProCode business account for business and personal transactions. The theft charges against Delmonico arose because he accepted his clients' checks with the intent not to perform under his business contracts and he used the funds beyond the scope of the clients' express or implied consent. This case does not stem from a civil breach of contract action filed by Delmonico's clients against ProCode, but criminal charges brought by the state of Ohio against Delmonico for grand theft and theft with an elderly specification in violation of R.C. 2913.02(A)(2). For ease of analysis, the opinion references Delmonico as the contracting party — rather than ProCode — and indicates any contracted work was performed by Delmonico even though a subcontractor may have assisted with the work.

(Tr. 803.) Delmonico blamed his delay on the weather. (Tr. 804.) The contractor sought access to Krupka's roof on November 21, 2017, but no work began prior to November 29, 2017. (Tr. 805, 807.)

{¶ 6} On November 29, 2017, Delmonico obtained a building permit from the city and removed two pine trees at the Krupka residence. (Tr. 807.) Delmonico worked at Krupka's home 5 or 6 times over the next few weeks and completed 5 of the 14 tasks delineated in his contract. (Tr. 809, 1259-1260.)

{¶ 7} As of December 6, 2017, Delmonico informed Krupka that he had completed the framing and, under the terms of the contract, was entitled to the second installment payment. (Tr. 1260.) Delmonico testified that he completed the work detailed in the contract that, upon its completion, entitled him to a second payment totaling $6,700. (Tr. 1260.) Krupka paid the second payment on December 6, 2017, in anticipation that Delmonico would finish the contracted work. (Tr. 814, 839.)

{¶ 8} Under the contract, Delmonico was required to remove Krupka's first-floor pine porch decking and replace it with a new composite floor. The composite floor cost twice as much as the pine decking. (Tr. 816.) Delmonico removed the pine porch decking. (Tr. 1256.) However, rather than installing the more expensive composite flooring as detailed in the contract and for which Krupka submitted payment, Delmonico installed new pine wood flooring on December 8, 2017. (Tr. 814-815.) Krupka refused to accept the incorrect and inferior materials, and the pine flooring was removed. (Tr. 862.) Delmonico informed Krupka that an

order for the composite flooring would be submitted the following week. (Tr. 817.) The composite flooring was never installed. (Tr. 862.)

{¶ 9} Krupka's indecision regarding the selection of square versus round columns resulted in a delay of work between January 2018 and March 2018. (Tr. 834.) However, after Krupka approved the round columns in March 2018, no additional work was completed.

{¶ 10} Delmonico stopped responding to Krupka's text messages in May 2018. (Tr. 834.) At that time, Krupka and her boyfriend, Leonard Wodzisz, researched Delmonico's business and came across a number of complaints relating to Delmonico and his business. (Tr. 875-876.) Krupka registered complaints with the Ohio Attorney General and the city of Lakewood Police regarding Delmonico and his failure to complete the contracted work. (Tr. 827, 876.)

{¶ 11} Krupka paid Delmonico $15,075 under her contract. (Tr. 830.) According to Krupka, Delmonico completed minimal work, and delivered some materials to the Krupka residence such as the less expensive pine deck flooring, shingles, and nails. (Tr. 837-838.) Krupka did not receive any additional materials, including the composite deck flooring, and Delmonico did not complete all of the work specified in the contract. (Tr. 830, 862.)

**Joyce and Tim Conway**

{¶ 12} Joyce and Tim Conway, residents of Westlake, were over 65 years old when they hired Delmonico as their contractor. (Tr. 604, 677.)[3]

{¶ 13} Joyce executed a contract with Delmonico on September 28, 2017, for kitchen and television room renovations with an estimated completion date of January 2018.[4] (Tr. 1197.) New kitchen cabinets were part of the kitchen renovation. (Tr. 615.) Delmonico told Joyce the price of her selected kitchen cabinets would increase the day after her contract was executed; Joyce executed the contract and assumed her deposit would be used to purchase cabinets at the then current price. (Tr. 635-636.) Joyce paid Delmonico a fifty percent deposit totaling $16,775.00. (Tr. 1197.)

{¶ 14} Joyce executed a second contract on October 23, 2017, whereby Delmonico agreed to perform additional work including the removal of the existing patio, installation of a new patio and deck, and waterproofing of the back wall. (Tr. 630, 1198, 1207-1208.) The completion date, as a result of the change of scope of work, was delayed until April 2018. (Tr. 1208.) Joyce paid a down payment for the second contract in the amount of $6,325.00. (Tr. 629.)

{¶ 15} Joyce and Tim expected the exterior work to begin upon execution of the second contract in October 2017. (Tr. 630.) Despite reassurances by Delmonico

---

[3] Both Joyce and Tim interacted with Delmonico, but only Joyce executed the contract with Delmonico.

[4] The contract clarified that the completion date of January 2018, was dependent upon the weather and changes to the scope of the project. (Tr. 613.)

via text and email that he would start in October, no work began until December 2017. (Tr. 672, 674, 691.)

{¶ 16} At the start of December, Delmonico tore out the patio and left behind large concrete chunks that were unsightly to the Conways. (Tr. 638.) The Conways thought that Delmonico would lay down gravel where the patio had been removed. (Tr. 638.) Instead, Delmonico laid broken pieces of brick that "looked like rubble over the mud." (Tr. 638.) Delmonico countered that the recycled or crushed cinder blocks were the standard materials used in this manner and "didn't have to look pretty" because they would be covered by filter fabric and gravel before installation of the deck. (Tr. 1202.) Removal of the patio and installation of broken brick represent the only work Delmonico completed under his two contracts with Joyce. (Tr. 643.)

{¶ 17} Delmonico completed no work at the Conways in January and February 2018. (Tr. 1168.) During that time, the contractor had multiple excuses as to why he could not work, including a trip to Kalahari Resort for his daughter's birthday celebration, and a ski trip to Peek'n Peak Ski Resort to celebrate his son's birthday. (Tr. 639-640.)

{¶ 18} In March 2018, the Conways heard a negative news story regarding Delmonico and his construction work. (Tr. 640.) The Conways learned Delmonico was no longer licensed to work in Westlake and requested an immediate refund. (Tr. 705-707.) Delmonico informed the Conways he was filing for bankruptcy and provided them his bankruptcy attorney's contact information. (Tr. 641.) Following

that time, Joyce contacted KraftMaid, the cabinet manufacturer, but the company was unfamiliar with Delmonico's name and did not provide any information regarding an alleged order for cabinets to be installed at the Conways. (Tr. 637.) The Conways did not receive any materials or supplies, including kitchen cabinets, despite their down payments totaling $23,000.00. (Tr. 636.)

## 2. Jessica Smith

{¶ 19} In November 2017, Smith, a recent widow and single parent, contacted Delmonico regarding a kitchen remodel for her Lakewood, Ohio home. (Tr. 507.) Smith executed a contract with Delmonico on December 4, 2017. (Tr. 512.) The contract required a fifty percent deposit totaling $18,275. (Tr. 517.) Delmonico urged Smith to execute the contract quickly, and to promptly submit her down payment, to ensure she obtained the sale price on her preferred kitchen cabinets. (Tr. 518.) Smith executed the contract on December 4, 2017, and delivered the agreed upon down payment the following day. (Tr. 520-521.) Delmonico deposited Smith's down payment in his business account. (Tr. 920.) While work was not scheduled to begin until February or March 2018, Smith understood the down payment would pay for the kitchen cabinets and starting materials. (Tr. 526-527.)

{¶ 20} On January 23, 2018, Smith requested, via text, to view the purchased cabinets. (Tr. 526) Delmonico indicated he stored the cabinets at a warehouse until installation and they were not available for viewing prior to that time. (Tr. 527.) Smith never observed the cabinets. (Tr. 527.)

{¶ 21} Smith and Delmonico texted one another regarding the contracted project between December 2017 and February 24, 2018. (Tr. 522.) In mid-February, Smith saw a negative news story regarding Delmonico and his construction business. (Tr. 529, 556.) To assuage Smith's concerns regarding Delmonico's ability to perform on their contract, they executed an addendum on February 24, 2018, that identified new scheduling and performance dates. (Tr. 521, 529, 558.) Under the addendum, Delmonico delayed the completion date to July 15, 2018, and implemented the following deadlines: blueprints submitted by March 16, 2018, commencement of work between April 16, 2018, and April 23, 2018, and completion by July 15, 2018. (Tr. 530-531, 560.) If Delmonico failed to meet any of the agreed upon dates, he would return one hundred percent of Smith's deposit. (Tr. 529.)

{¶ 22} On April 6, 2018, Delmonico indicated via text that construction would begin the following week. (Tr. 528.) Delmonico's next communication sent on April 15, 2018, indicated his intent to file for bankruptcy and that Smith should direct any further communication to his bankruptcy attorney. (Tr. 533.)

{¶ 23} No work was completed at Smith's house pursuant to her agreement with Delmonico. (Tr. 599, 1186.)

{¶ 24} All three clients, Krupka, the Conways, and Smith, granted Delmonico consent to use their deposits on their projects. None of the clients granted Delmonico permission to use their deposits on purchases outside the scope of their construction projects. (Tr. 539, 636, 830.) The clients' down payments were

deposited into Delmonico's business account, which Delmonico accessed and used as his own personal bank account. (Tr. 1237.) None of the projects were completed and Delmonico did not refund the clients. (Tr. 534, 674-675, 830.) Moreover, outside the minimal work performed at the Krupka and Conway residences, Delmonico failed to provide any supplies or materials, such as cabinets, that were allegedly ordered nor did the contractor provide any documentation that those items were ordered.

### 3. Criminal Investigation

{¶ 25} Based upon the loss of their payments to Delmonico and the lack of work completed by the contractor, Krupka and Smith filed complaints with the Lakewood Police Department, and Joyce and Tim Conway filed a complaint with the Westlake Police Department. Detective Motylewski from the Lakewood Police Department and Detective Weisbarth with the Westlake Police Department completed a criminal investigation of Delmonico.

{¶ 26} Delmonico maintained all of his clients' funds in one business account, and attempted to manage the funds through simple accounting practices. Yet, Delmonico purchased many materials in bulk, making it difficult to identify the funds spent for each individual client. (Tr. 1223-1225.)

{¶ 27} The detectives attempted to track Delmonico's business funds to see if he used his clients' money for its intended purpose — to buy materials for the clients' projects. (Tr. 1085.) Officer Motylewski was unable to locate purchase orders or receipts from Home Depot that reflected materials were purchased by

Delmonico for the three clients.[5] (Tr. 925.) Detective Weisbarth communicated with several of Delmonico's vendors, but was unable to track any purchases for materials related to the clients' projects. (Tr. 1064.) Detective Weisbarth admitted she did not discover evidence of any work completed for the three clients although the testimony of Krupka and the Conways indicated Delmonico completed some work at those two residences. (Tr. 1076, 1078.)

{¶ 28} The detectives confirmed that in February and March 2018, following Delmonico's receipt of the clients' payments, the contractor made ATM withdrawals from his business account at Illinois and Ohio casinos. (Tr. 962, 1017.) Delmonico and his family also went on overnight trips to Kalahari Water Park and Peek'n Peak Ski Resort in February and March 2018, respectively. (Tr. 1316.)

{¶ 29} In February 2018, negative news stories were televised regarding Delmonico's business. (Tr. 1178.) As a result of those stories, many of Delmonico's clients requested refunds and he was unable to procure new business. (Tr. 1179.) Delmonico provided clients with the name and number of his bankruptcy attorney. (Tr. 1246.) However, no bankruptcy filing occurred; Delmonico was statutorily disallowed from filing bankruptcy because of a prior 2010 bankruptcy case. (Tr. 1246.) Delmonico took steps to close his business including the cancellation of

---

[5] Detective Motylewski discovered that Delmonico purchased approximately $19,000 worth of Home Depot gift cards from GetGo. Delmonico distributed the gift cards to his subcontractors who purchased materials and supplies at Home Depot for his clients' projects. Detective Motylewski met with Home Depot's loss prevention investigation office and attempted, to no avail, to locate receipts related to purchases associated with the Krupka, Conway, and Smiths' projects. (Tr. 925-926.)

his liability insurance on April 12, 2018, and the sale of many of his business assets. (Tr. 1024.)

## B. Procedural History

{¶ 30} On September 27, 2018, Delmonico was indicted, in violation of R.C. 2913.02(A)(2), on two counts of grand theft, each fourth-degree felonies, and on one count of theft with an elderly specification, a third-degree felony. A jury trial began on February 25, 2019, and the jury returned a guilty verdict on all three counts. On April 17, 2019, the court sentenced Delmonico to 12 months on Counts 1 and 2, to run concurrently to one another and consecutive to the 36-month sentence on Count 3, for an aggregate sentence of 48 months. The court also ordered payment of restitution to Krupka, the Conways, and Smith in the amounts of $15,075, $23,100, and $18,275, respectively. Delmonico filed a timely appeal on May 17, 2019, raising the following assignments of error for our review:

> Assignment of Error I: Mr. Delmonico's convictions were not supported by sufficient evidence.
>
> Assignment of Error II: Mr. Delmonico's convictions were against the manifest weight of the evidence.
>
> Assignment of Error III: The trial court erred in imposing consecutive sentences. [6]

---

[6] Following Delmonico's timely filing of an appeal, submission of briefs, and oral arguments by both parties, Delmonico received judicial release as reflected in a February 11, 2020 journal entry. Judicial release did not render this appeal moot because the trial court reserved the right to reimpose Delmonico's sentence should he violate the conditions of his community-control sanctions.

## II.  Law and Analysis

### A. Sufficiency of the Evidence

**{¶ 31}**  In his first assignment of error, Delmonico argues that the state did not prove he acted with the necessary intent to deprive his clients at the time the parties entered their contracts, and therefore, the convictions should be vacated due to insufficient evidence.  We disagree.

**{¶ 32}**  Where a party challenges the sufficiency of the evidence supporting a conviction, a determination of whether the state has met its burden of production at trial is conducted.  *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).  An appellate court reviewing sufficiency of the evidence must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'"  *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction.  *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387.  A sufficiency of the evidence argument is not a factual determination, but a question of law.  *Id.* at 386, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955).

{¶ 33} Here, the jury found Delmonico guilty under R.C. 2913.02(A)(2) of two counts of grand theft, fourth-degree felonies, and one count of theft, a third-degree felony, with an elderly specification.[7] R.C. 2913.02(A)(2) prohibits the theft of money by knowingly obtaining or exerting control over the property beyond the scope of the express or implied consent of the owner and with the purpose to deprive the owner of the money.

{¶ 34} The term "deprive," as used in R.C. 2913.02(A)(2), and as applied in the case sub judice, is defined as follows:

> Accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration.

R.C. 2913.01(C)(3).

{¶ 35} The instant theft case stems from contracts for services. To prove theft in violation of 2913.02(A)(2), the state must demonstrate that when the accused "'exceeded the scope of consent of the owner of the money, he intended to deprive the owner of the money.'" *State v. Kerr*, 6th Dist. Ottawa No. OT-13-036, 2015-Ohio-2228, ¶ 19, quoting *State v. Coleman*, 2d Dist. Champaign No. 2002 CA 17, 2003-Ohio-5724, ¶ 29, citing *State v. Dortch*, 2d Dist. Montgomery No. 17700,

---

[7] According to R.C. 2913.02(B)(3), theft of property or services in an amount between $500.00 and $37,500 is classified as a third-degree felony. Additionally, if the victim of a theft offense delineated under R.C. 2913.02 is an elderly person, the theft constitutes theft from a person in a protected class. Joyce and Tim Conway meet the definition of an elderly person — a person aged 65 years or older — and Delmonico's charges stemming from the theft offense against the Conways included an elderly specification. R.C. 2913.02(B)(3); R.C. 2913.01(CC).

1999 Ohio App. LEXIS 4838 (Oct. 15, 1999). A person in receipt of another's money must use those funds for their intended purpose or risk charges under R.C. 2913.02(A)(2) for exceeding the scope of the owner's consent:

> Once a person lawfully has control over property with consent, that person cannot thereafter exert control for a different purpose. That person already has control. Instead, what changes is whether or not the individual [acts] within the scope of the consent. If the individual begins to use the property for something outside what the owner specifically authorized, the individual has gone beyond the owner's consent. The statute allows for this precise situation in R.C. 2913.02(A)(2).

*Dortch* at *10.

{¶ 36} Intent of a theft offense is not established through direct testimony of a third person but "'may be inferred from the circumstances surrounding the crime.'" *State v. Catney*, 8th Dist. Cuyahoga No. 104141, 2017-Ohio-90, ¶ 29, quoting *State v. Fasino*, 8th Dist. Cuyahoga No. 101788, 2015-Ohio-2265, ¶ 15, quoting *State v. Herring*, 94 Ohio St.3d 246, 266, 762 N.E.2d 940 (2002).

{¶ 37} Delmonico argues his convictions were not supported by sufficient evidence. Specifically, Delmonico contends that while he did not complete the contracted projects for Krupka, the Conways, and Smith, he performed some work on each project and that work demonstrated Delmonico's intent to fulfill his contractual obligations. Delmonico argues that the completion of some work precluded the state from proving that at the time Delmonico accepted money from his clients, he intended to exceed the scope of the owners' consent and deprive the owners of the money. The state, in contrast, argues it presented sufficient evidence

because minimal performance on a contract does not negate the intent required to support a theft conviction.

{¶ 38} Completion of a significant amount of the work under a contract "'precludes an inference that the defendant exceeded the scope of the owner's consent with intent to deprive the owner of the money (R.C. 2913.02(A)(2)).'" *Kerr*, 6th Dist. Ottawa No. OT-13-036, 2015-Ohio-2228, at ¶ 20, quoting *Coleman*, 2d Dist. Champaign No. 2002 CA 17, 2003-Ohio-5724, at ¶ 40. Conversely, minimal performance on a contract does not prevent a finding of intent required to support a theft conviction under R.C. 2913.02(A)(2). *Kerr* at ¶ 22.

{¶ 39} The facts of *Kerr* are analogous and instructive to the case sub judice. Appellant-contractor Kerr received and cashed two checks from client Lenz for the purchase and installation of a steel barn. Kerr submitted the barn order to the manufacturer, but no payment was submitted to the manufacturer and the order was not processed. Kerr did not complete the preliminary on-site work required before the barn could be erected. No building materials were delivered to Lenz's property and the steel barn was not erected. Kerr did not refund any money to Lenz. Kerr's placement of the barn order did not constitute significant performance under the contract. Kerr's actions were found to exceed the scope of Lenz's consent with the intent to deprive Lenz under R.C. 2913.02(A)(2). *See State v. Dalton*, 11th Dist. Portage No. 2008-P-0097, 2009-Ohio-3149, ¶ 33 (acceptance of full payment under a construction contract, minimal performance of the contracted duties, and

contractor's avoidance of the client provided sufficient evidence to infer that the contractor intended to deprive the client of her money under R.C. 2913.02(A)(2)).

{¶ 40} Delmonico relies upon *Orange Village v. Woolfolk*, 8th Dist. Cuyahoga No. 77451, 2000 Ohio App. LEXIS 4624 (Oct. 5, 2000), to argue he may have breached his contracts, but his acts did not constitute theft. Woolfolk operated a snowplowing service and solicited customers with flyers. A complaining client paid his full contract price in advance and, in exchange, Woolfolk was to place stakes in the client's driveway and plow as needed. The client alleged Woolfolk failed to complete any of his contractual obligations and the client filed a breach of contract claim with a small claims court. On the day of the small claims trial, the contractor made full restitution. Woolfolk was subsequently charged criminally and found guilty for theft under R.C. 2913.02(A)(3).

{¶ 41} The contractor testified at his criminal trial that he installed driveway stakes for the complaining client. The contractor conceded that due to heavy snowfall throughout one week and the fact that some of his trucks broke down at that time, he failed to plow driveways as agreed to under his contracts, including for the complaining client's. Thirty to forty customers canceled due to Woolfolk's failures. This court vacated Woolfolk's conviction because the complaining client obtained full restitution under his civil action. The *Woolfolk* court further commented that the contractor's actions — committing to 300 contracts with only four snowplow trucks — were representative of bad business judgment rather than theft.

{¶ 42} In contrast, this case is not about whether Delmonico *could* have fulfilled the contracts for Krupka, the Conways, and Smith — an issue that is immaterial to a theft offense under R.C. 2913.02(A)(2) — but whether he *intended* to fulfill those contracts. Further, no restitution was offered nor attempted by Delmonico. The acts of Woolfolk, who failed to satisfy the terms of his contract for one week and for which he paid restitution in full, are not comparable to Delmonico's actions.

{¶ 43} Here, minimal supplies were delivered or used at the Krupka and Conway residences and minimal work was completed at those projects. At Krupka's home, Delmonico completed approximately 5 of 14 tasks delineated in the contract. (Tr. 1259-1260.) While Delmonico completed work on Krupka's project, Delmonico admitted he performed the tasks that triggered the terms of the contract requiring Krupka's second payment. (Tr. 1260.) Upon submission of Krupka's second payment, Delmonico completed no additional work. (Tr. 1260.) Krupka paid Delmonico to purchase and install composite flooring on her front porch, not pine flooring that costs one half the price of the composite flooring. (Tr. 788, 814-815.) Delmonico did not install composite flooring and the product was not delivered to the Krupka residence. (Tr. 830, 862.) No evidence was introduced, verbally or written, to establish that Delmonico ordered the composite flooring. Delmonico did not refund Krupka for any of the unfinished work. (Tr. 830.)

{¶ 44} The Conways were over the age of 65 when they contracted with Delmonico. (Tr. 604, 677.) The Conways contracted for interior renovations

including kitchen remodeling and the installation of a bay window; a new patio and deck; and waterproofing. (State's exhibit Nos. 21 and 22.) Delmonico removed the patio and delivered ground-up brick to cover the area; no additional work was completed. (Tr. 643.) Further, no supplies, such as kitchen cabinets that were selected and presumably paid for by the Conways, were delivered to their home. (Tr. 708.) Delmonico testified that he ordered the Conways' kitchen cabinets via email and "had a lot of stuff that was ordered." (Tr. 1209, 1274.) No written evidence was presented in support of the kitchen cabinet order, and the Conways testified they received no materials for their project. (Tr. 1120.) The Conways did not receive a refund from Delmonico. (Tr. 706.)

{¶ 45} After accepting Smith's down payment, the only work performed by Delmonico was submission of the project plans to the city of Lakewood and the issuance of a permit from the city.[8] (Tr. 599, 1186.) No materials or supplies were delivered to Smith. (Tr. 579.) Delmonico assured Smith, via text, that her kitchen cabinets were ordered, yet the cabinets were not delivered. (Tr. 562-563.) At trial, Delmonico testified that he ordered, by email, Smith's cabinets within a day after she executed the initial contract to ensure the cabinets were subject to the then-sale price. (Tr. 1189-1191.) Delmonico did not introduce the alleged email sent to order Smith's cabinetry. Further, Delmonico later testified that while he had submitted

---

[8] Delmonico and Smith presented conflicting testimony regarding the project plans and work permit. Smith testified that Delmonico failed to submit plans to the city of Lakewood, and to obtain a work permit for the project. (Tr. 578.) However, Delmonico introduced evidence at trial that showed Smith's plans were submitted and approved, and a building permit issued by the city of Lakewood. (Tr. 535, 1186.)

the order for Smith's cabinets — as well as the Conways' cabinets — he had not paid any money for the cabinets. (Tr. 1266-1267.) Delmonico also testified that he purchased sink bays and pull-out drawers for the Smith project, but he never thought to deliver those items to her residence. (Tr. 1269-1270.) Smith never received her cabinets nor any related supplies nor was she told her kitchen cabinets were available for pick-up. (Tr. 579.) Delmonico failed to complete any actual labor at Smith's home. (Tr. 528, 535.) No monies were refunded to Smith. (Tr. 534.)

{¶ 46} Delmonico claimed he had extensive detailed receipts for all client purchases, yet none were submitted in support of his claims that he purchased materials for Krupka, the Conways, and Smith. (Tr. 1225.) Delmonico stated he used the clients' payments to secure needed materials for the projects. (Tr. 1252.) Delmonico testified that he stored purchased materials at his office, and they were available at the time of trial. (Tr. 1291-1292.) Yet, the court was not made aware of any attempt by Delmonico to deliver those products to his clients.

{¶ 47} Further, Delmonico accessed his business checking account — where he deposited the clients' payments — as his own personal bank account. (Tr. 1284.) Delmonico withdrew funds from his business account in November 2017, February 2018, and March 2018, to gamble. (Tr. 1283-1284) Delmonico traveled with his family to Kalahari Water Park and Peek'n Peak Ski Resort in February and March 2018, respectively. (Tr. 1316.) This testimony, if believed, supported the state's claims that Delmonico used his clients' money beyond their express or implied scope of consent.

{¶ 48} In construing the evidence most favorable to the prosecution, we reject Delmonico's contention that his convictions are not supported by sufficient evidence. The state presented contrary evidence which, if believed, was sufficient to show that Delmonico knowingly acted with purpose to deprive the clients of their money by exerting control over such property beyond the scope of the owner's express or implied consent. Thus, Delmonico's first assignment of error is overruled.

**B. Manifest Weight of the Evidence**

{¶ 49} In his second assignment of error, Delmonico contends that the verdict was against the manifest weight of the evidence. A manifest-weight challenge tests whether the prosecution has met its burden of persuasion. *Thompkins*, 78 Ohio St.at 390, 678 N.E.2d 541, (Cook, J., dissenting). A reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 50} Delmonico argues the state did not introduce substantial evidence that at the time he contracted with the clients, Delmonico intended to accept the

money without performing the contracted work, and therefore, acted outside the scope of the clients' consent.

{¶ 51} Upon our review of the record, we find there is competent, credible evidence showing that Delmonico did not significantly perform under his clients' contracts despite his acceptance of payments from Krupka, the Conways, and Smith and he knowingly deprived the clients of their money by exerting control beyond the scope of the clients' express or implied consent.

{¶ 52} There was contrary testimony that Delmonico purchased materials for all three projects, some of which were stored at Delmonico's place of business. There was also testimony from Delmonico that he had receipts for purchased materials and supplies, and he ordered the cabinets for the Conway and Smith projects. However, the jury, as permitted in its role as trier of fact, found this testimony less than credible. In support of the state's evidence, Krupka testified about the materials delivered and installed at her home and the failure of Delmonico to install the pricier composite decking for which she contracted and paid. The Conways testified to the minimal work completed on their patio and the failure of Delmonico to deliver the cabinets for which Joyce had paid. Smith stated no materials were delivered to her job site and she was not notified of the availability of any materials, such as the kitchen cabinets she selected and paid for with her down payment. Delmonico failed to introduce written documentation demonstrating the materials and supplies purchased for the individual projects or the availability of those items to the clients.

{¶ 53} Additionally, Delmonico's negotiation of a second contract with Smith in March 2018 — without any other work in furtherance of his contractual requirements — did not negate the finding that Delmonico intended to exceed the scope of his client's consent with the purpose of depriving Smith of her money. *Contra Coleman*, 2d Dist. Champaign No. 2002 CA 17, 2003-Ohio-5724 (where a contractor was accused of using his client's money beyond the scope of express or implied consent, the execution of a promissory note for full repayment and the negotiation and signing of a new contract, coupled with the contractor's possession of the needed construction materials and offer to complete the contracted work — and the client's admission that he never intended to comply with the renegotiated contract — supported a finding that the contractor's conviction under R.C. 2913.02(A)(2) was against the manifest weight of the evidence.).

{¶ 54} The evidence supports the conclusion that Delmonico intended to deprive his clients of their money when their contracts were entered into, in violation of R.C. 2913.02(A)(2). Delmonico's convictions are not against the manifest weight of the evidence and Delmonico's second assignment of error is overruled.

## C. Consecutive Sentences

{¶ 55} In his third assignment of error, Delmonico declares that the imposition of consecutive sentences does not comport with the requirements of R.C. 2929.14(C)(4), and therefore, his sentences should be vacated, and the case remanded for resentencing.

{¶ 56} In Ohio, there is a presumption that prison sentences should be served concurrently, unless the trial court makes the findings outlined in R.C. 2929.14(C)(4) to warrant consecutive service of the prison terms. *State v. Morris*, 2016-Ohio-7614, 73 N.E.3d 1010, ¶ 25 (8th Dist.), citing *State v. Primm*, 8th Dist. Cuyahoga No. 103548, 2016-Ohio-5237, ¶ 64, citing *State v. Cox*, 8th Dist. Cuyahoga No. 102629, 2016-Ohio-20, ¶ 3, and R.C. 2929.41(A). Initially, the sentencing court must find that (1) a consecutive sentence is necessary to protect the public from future crime or to punish the offender, and (2) the consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. R.C. 2929.14(C)(4). Finally, the court must also find that any one of the following apply:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).

{¶ 57} The sentencing court must make the statutory findings at the sentencing hearing and also incorporate the findings into its sentencing entry. *State*

*v. Hendricks*, 8th Dist. Cuyahoga No. 101864, 2015-Ohio-2268, ¶ 12, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus. At the sentencing hearing, the court must state it entered into the statutory analysis and considered the statutory criteria as well as provide the bases for its decision. *Morris* at ¶ 26. "However, a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell* at ¶ 29. A sentencing court's failure to make the statutory findings is "'contrary to law.'" *Hendricks* at ¶ 12, quoting *Bonnell* at ¶ 37.

{¶ 58} A reviewing court may overturn the imposition of consecutive sentences, under R.C. 2953.08, where the appellate court "clearly and convincingly finds that 'the record does not support the sentencing court's findings' under R.C. 2929.14(C)(4), or the sentence is 'otherwise contrary to law.'" *Hendricks* at ¶ 9, quoting R.C. 2953.08(G)(2)(a) through 2953.08(G)(2)(b).

{¶ 59} When the trial court sentenced Delmonico, it made the following findings in open court and on the record:

> I'm finding specifically that consecutive sentences are necessary to punish you and to protect the future criminal activity with this business of contracting. It's not disproportionate to this. Great and unusual harm. $56,000.

> Therefore, I'm finding specifically the harm is so great or unusual a single term would not adequately reflect the seriousness of your conduct and that your prior criminal history, all those misdemeanor alcohol-related cases, require that you straighten your life out in the

future so you do not victimize anyone else again in this business, and that no civil bankruptcy or LLC will protect you from your criminal acts, and you're fooling yourself if you think that will work.

I'm ordering restitution. * * *

(Tr. 1467-1468.)

{¶ 60} We find these statements satisfied R.C. 2929.14(C)(4). First, the trial court found that consecutive sentences are necessary to protect the public from future crime by Delmonico and to punish the offender. Per R.C. 2929.14(C)(4), only one of these findings was necessary.

{¶ 61} Next, the trial judge stated: "It's not disproportionate to this. Great and unusual harm. $56,000." (Tr. 1467.) The court also stated that Delmonico's actions betrayed the trust of each client in their most important investment, their home. (Tr. 1464.) Delmonico intended to deprive Krupka, the Conways, and Smith of their money and planned to fall back on bankruptcy or other legal recourse to avoid financial responsibility. (Tr. 1465.) These comments support the court's finding that consecutive sentences were not disproportionate to Delmonico's behavior or the danger he posed to the public.

{¶ 62} In reference to R.C. 2929.14(C)(4)(a)-(c), the trial judge found Delmonico's criminal history — 15 misdemeanors — supported consecutive sentences to avoid any future victimization. (Tr. 1467.)

{¶ 63} Delmonico argues that the trial court failed to explain, with specificity, why consecutive sentences were necessary to punish Delmonico and to protect the public from future criminal activity, and that doing so would not be

disproportionate to the seriousness of Delmonico's conduct and the danger Delmonico poses to the public. However, R.C. 2929.14(C)(4) requires a trial court imposing consecutive sentences to state the required findings at the sentencing hearing so as to provide notice to the offender. *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, at ¶ 28. A trial court is not required to provide reasons supporting its imposition of consecutive sentences. *Id.* at ¶ 27.

{¶ 64} The trial court's statements satisfied R.C. 2929.14(C)(4), and the record clearly and convincingly supports these findings. Therefore, the trial court did not err in imposing consecutive sentences and Delmonico's third assignment of error is overruled.

{¶ 65} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
RAYMOND C. HEADEN, JUDGE

EILEEN T. GALLAGHER, A.J., and
PATRICIA ANN BLACKMON, J., CONCUR